# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Red Apple iPhone, IMEI: 356552102651890<br>Seized as Exhibit N-30 ("Target Device") | )<br>)<br>) Case No.  '23  MJ1188<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ____Southern____ District of ____California____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute |
| 21 USC Sec. 846 | Conspiracy to Possess a Controlled Substance with Intent to Distribute |

The application is based on these facts:
See attached affidavit, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Joseph Clark*
*Applicant's signature*

Joseph Clark, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____telephone____  *(specify reliable electronic means)*.

*/s/ Daniel E. Butcher*
*Judge's signature*

Date: April 5, 2023

City and state: San Diego, California     Hon. Daniel E. Butcher, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Drug Enforcement Special Agent Joseph Clark, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

> Red Apple iPhone
> IMEI: 356552102651890
> Seized as Exhibit N-30
> ("**Target Device**")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of 21 U.S.C. §§ 841(a)(1) and 846, as described in Attachment B. The requested warrant relates to the investigation of Juan SALAZAR ("SALAZAR") for possessing mixtures and substances containing a detectable amount of methamphetamine, cocaine, and gamma-hydroxybutyric acid ("GHB") with the intent to distribute said mixtures and substances to another person. The **Target Device** is currently in the custody of the Drug Enforcement Administration, at 4560 Viewridge Avenue, San Diego, CA 92123.

2. Based on the information below, there is probable cause to belief that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

3. The information contained in this affidavit is based upon my training, experience, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from my direct participation and observations in this investigation, having reviewed reports prepared by other law enforcement agents and officers and other evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish requisite probable cause.

## TRAINING AND EXPERIENCE

4. I am a Special Agent Criminal Investigator for the United States Drug Enforcement Administration ("DEA"), and I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered by law to conduct investigations and to make arrests for felony offenses. I was hired by the DEA in June of 2019, and I attended the DEA academy for approximately sixteen weeks in Quantico, Virginia. While at the DEA academy, I received training in all aspects of narcotics investigations. I was sworn as a DEA Special Agent in December 2019 and assigned to DEA San Diego Field Division's Enforcement Group 61 in Carlsbad, California. This group primarily investigates illegal drug trafficking organizations operating in the United States and internationally, including those organizations whose operations involve the distribution of wholesale quantities of methamphetamine, fentanyl, heroin, cocaine, marijuana, and other illicit drugs in and around the Southern District of California. In addition to the aforementioned group, I am assigned to the DEA San Diego Field Division County of San Diego Integrated Narcotics Task Force (NTF) Team 10, who primarily investigates the distribution of illicit narcotics as it relates to overdose deaths from those distributed narcotics.

5. In connection with my official DEA duties, I investigate criminal violations of federal drug laws and related offenses, including violations of Title 21, United States Code, 801 et seq. and the Federal Controlled Substance Act. I have received training, both formal and informal, in the enforcement of the drug laws, investigation of drug trafficking and money laundering organizations, drug recognition and terminology, undercover operations, interviewing techniques, and electronic as well as physical surveillance procedures.

6. I have conducted investigations and/or participated in investigations related to the unlawful importation, possession with intent to distribute, and distribution of controlled substances. In conducting/participating in these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources. Through my training, experience, and

interaction with experienced agents, and other narcotics investigators, I have become familiar with the methods employed by narcotics traffickers in general, and large Mexico-based Drug Trafficking Organizations ("DTO") in particular, to smuggle, safeguard, and distribute narcotics, and to collect and launder narcotics-related proceeds.

7. Based on my experience, participation in the investigation of narcotics organizations, conversations with other agents, including those from the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HIS"), Bureau of Alcohol, Tobacco and Firearms ("ATF"), U.S. Customs and Border Protection ("CBP"), and other state and local law enforcement officers familiar with narcotics trafficking, distribution, and money laundering matters, I understand methods used by narcotics trafficking organizations to smuggle and distribute their products.

8. I have conducted investigations involving residences that have been identified as dealing in narcotics including fentanyl and have been present during the surveillance of these residences that have been identified as dealing in narcotics including fentanyl. I am familiar with the patterns associated with the trafficking of narcotics including fentanyl as practiced locally. I have become familiar with narcotics slang and jargon as it pertains to the sales and transportation of narcotics including fentanyl. I have been involved in numerous arrests of persons involved in possession of drugs for sale, and numerous arrests of persons for the possession of controlled substances, including fentanyl.

9. During these investigations I have spoken to drug users and dealers who have told me the different ways they use drugs, package drugs, and different slang terms and language they use to sell drugs. I am familiar with the signs and symptoms of someone being under the influence of narcotics. I have monitored and reviewed dozens of recorded telephone calls pursuant to Title III court orders in narcotics and gang related investigations and have handled confidential sources with access to drug dealers and gang members.

10. Based on my training and experience, I am familiar with how drug traffickers communicate and operate. For example, I am aware that drug traffickers frequently discuss criminal activity using cellular telephones and social media applications such as Facebook,

Instagram, and Snapchat, and that they often use coded language to obfuscate these conversations. I also know that drug traffickers change telephones to evade detection by law enforcement. Moreover, I know that drug traffickers obtain telephones from third parties and or subscribe to them in fictitious names in order to mask the identity of the individuals using the telephones. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money, which represents the proceeds of drug trafficking and other criminal activity.

11. Based upon my training, experience, and consultations with law enforcement officers experienced in controlled substance investigations, and all the facts and opinions set forth in this affidavit, I am aware that conspiracies involving distribution of controlled substances generate many types of evidence including, but not limited to, cellular phone and computer-related evidence such as voicemail messages referring to the arrangements of payment, names and contact information for co-conspirators, photographs, text messages, emails, messages from text messaging applications such as WhatsApp, Text Now, social networking messages, and videos reflecting co-conspirators or illegal activity. I am also aware that cellular telephones (including their SIM card(s) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a trafficker's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my training and experience as a DEA Special Agent, my participation in the investigation of narcotic organizations, and consultations with law enforcement officers experienced with narcotic trafficking, controlled substance manufacture and distribution, and money laundering investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

 a. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages;

 b. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

 c. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

 d. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

 e. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones to negotiate the price, type, and quantity of drugs being sold to customers, and received from suppliers;

 f. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones to arrange times and places to meet with customers to deliver illegal drugs, and to arrange times and places to meet with suppliers to receive illegal drugs;

 g. Narcotics traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as ongoing enforcement operations in their area such as checkpoints and border crossings;

 h. Narcotics traffickers and their co-conspirators often use cellular/mobile telephones to record money owed to customers and suppliers and as evidence of past orders received and/or delivered; and

    i.      The use of cellular telephones and other mobile communication devices by conspirators or narcotics traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

14. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

    a.      tending to indicate efforts to possess with intent to distribute methamphetamine, cocaine, GHB, or other federally controlled substances within the United States;

    b.      tending to identify accounts, facilities, storage Device, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of or possession with the intent to distribute methamphetamine, cocaine, GHB, or some other federally controlled substance, within the United States;

    c.      tending to identify co-conspirators, criminal associates, or others involved in the distribution of or the possession with the intent to distribute methamphetamine, cocaine, GHB, or some other federally controlled substance, within the United States;

    d.      tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute methamphetamine, cocaine, GHB, or some other federally controlled substance, within the United States, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

### A.    The Decedent's Suspected Fentanyl Overdose Death

15.    On or about May 9, 2022, law enforcement officers responded to a suspected fentanyl overdose death at an apartment in San Diego County.

16.    According to the decedent's roommates, the decedent was found in the morning unresponsive on her bed. One of the roommates pulled the decedent off her bed and tried to perform CPR, but the decedent's body was stiff and displayed obvious signs of death.

17.    Law enforcement discovered a smoking device with black and brown residue on the hallway floor leading to the decedent's bedroom. Officers also found a crinkled piece of aluminum foil with black and brown residue on the decedent's bed. The smoking device and aluminum foil both tested positive for the presence of fentanyl. The smoking device also tested positive for the presence of methamphetamine.

### B.    D.T. Provided the Narcotics to the Decedent

18.    Law enforcement officers also discovered two cell phones on the decedent's bed. Both phones were identified as belonging to the decedent. One of the phones displayed on its locked screen approximately 14 iMessages and eight missed calls from a saved contact listed as "DT." ("D.T.")

19.    D.T. was identified by witnesses as an acquaintance of the decedent. According to the decedent's supervisor at work, D.T. called the decedent's place of employment the morning of decedent's death demanding to speak with the decedent and frantically asking how the decedent was doing.

//

20. Based on record checks, law enforcement officers learned that D.T. is on formal probation with an active Fourth Amendment waiver.

21. D.T.'s probation officer and I conducted a Fourth Amendment waiver search and seized D.T.'s cell phone. Upon a review of the phone, I confirmed that D.T.'s phone number was the same number listed for "DT" in the decedent's cell phone. I also located text messages between D.T. and the decedent from May 8, 2022 at 11:27 pm to May 9, 2022 at 10:37 am. Over the course of those messages, the decedent informed D.T. that she was hurting, was taking "norco" to get by, and needed a good amount of it to hold her over. D.T. agreed and told the decedent to get cash from the ATM. D.T. sent the decedent the address of his location. Later, text messages show that the decedent arrived at the specified location on May 9, 2022 at 12:47 am. D.T. called the decedent at 2:47 am. D.T. subsequently texted and called the decedent 18 more times with no response from the decedent.

**C.     D.T. Received the Narcotics from H.M.'s Associate**

22. In addition to communications with the decedent, I searched D.T.'s cell phone for communications relating to the decedent's suspected fentanyl overdose death. I located text messages on May 9, 2022, from 1:26 to 2:11 am, between D.T. and another contact with a San Diego-based phone number ("H.M.") about a suspected narcotics transaction. During that time period, H.M. texted D.T. that H.M.'s guy was "there with the pills."

23. Cell site data of cell phones belonging to the decedent, D.T., and H.M. show that on May 9, 2022, at 1:36 am and 2:11 am, the decedent, D.T., and H.M. were all within one mile of the address that D.T. sent to the decedent earlier that night. Cell site data further shows that at 2:47 am, the decedent and D.T. were in the same exact location. Later, at 3:28 am, cell site data shows that D.T. was at a hotel in Poway, California and the decedent returned to her apartment in San Diego County.

//
//

### D. Law Enforcement Observed H.M. Driving to and Parking his Car Outside a House at 4671 East Talmadge Drive on Multiple Occasions

24. On or about July 14, 2022, law enforcement agents surveilled H.M. outside his apartment in San Diego County. Agents observed H.M. leave his apartment, get into a car, and drive to a house located at 4671 East Talmadge Drive in San Diego, California. Prior to arriving at the house, agents observed H.M. perform unusual U-Turns and other seemingly unnecessary turns with his car. Based on my training and experience, I believe that these unusual turns were countersurveillance maneuvers and H.M. performed them to assess if anyone was following him and to prevent law enforcement from surveilling his whereabouts and the locations he had visited.

25. On or about July 15, 2022, law enforcement agents surveilled H.M. again and observed H.M. perform the same unusual turns with his car on the way to the house located at 4671 East Talmadge Drive.

### E. Defendant Juan Carlos Salazar is the Owner of the House Located at 4671 East Talmadge Drive

26. Open source data queries, a return for a subpoena to San Diego Gas and Electric, and San Diego County tax collection information for the house located at 4671 East Talmadge Drive, show that the owner of the home is SALAZAR.

27. On or about July 19, 2022, law enforcement agents saw two cars parked outside 4671 East Talmadge Drive. One of the cars was a Toyota Prius bearing a California license plate. Record checks show that the Toyota was registered to SALAZAR.

### F. A Trash Pull of the Garbage Cans outside 4671 East Talmadge Drive Showed Evidence of Methamphetamine Use

28. On or about July 29, 2022, law enforcement agents conducted a trash pull outside 4671 East Talmadge Drive. Agents observed the garbage truck empty the two trash cans located outside the house and not make any further stops.

//

29. At a nearby, off-site location, agents saw within the trash a used syringe with a substance inside. The substance presumptively tested positive for the characteristics of methamphetamine. Agents also found within the trash a clear plastic Gatorade bottle. The bottle contained numerous used syringes with a substance inside. The substance inside the syringes appeared similar to the substance inside the syringe that presumptively tested positive for methamphetamine.

### G. A Court-Authorized Search of the House Located at 4671 East Talmadge Drive Resulted in the Seizure of Controlled Substances

30. On or about August 8, 2022, law enforcement agents obtained a warrant to search the house located at 4671 East Talmadge Drive for evidence of narcotics distribution.

31. On or about August 17, 2022, law enforcement agents executed the warrant to search 4671 East Talmadge Drive. During the search, for officer safety and to prevent potential destruction of evidence, agents detained SALAZAR, his temporary roommate, and a friend and frequent visitor of the home. When agents searched SALAZAR's person, they discovered a small container with a crystal-like substance inside. Agents also seized a cell phone belonging to SALAZAR, the **Target Device**.

32. During the search, agents discovered controlled substances inside the residence. The majority of the narcotics were located inside a guest bedroom that SALAZAR referred to as an "office."

33. Agents found the following substances inside the house:

- 1.46 kilograms (3.22 pounds) of a mixture and substance that presumptively tested positive for methamphetamine, a Schedule II Controlled Substance;

- 908.20 grams (2.00 pounds) of a mixture and substance that presumptively tested positive for cocaine, a Schedule II Controlled Substance;

- 4.203 kilograms (9.26 pounds) of a mixture and substance that presumptively tested positive for GHB, a Schedule I Controlled Substance;

- 654.30 grams (1.44 pounds) of a mixture and substance that presumptively tested positive for 3,4-methylenedioxymethamphetamine (MDMA), a Schedule I Controlled Substance; and

- 408.3 grams (0.90 pound) of a mixture and substance that presumptively tested positive for ketamine, a Schedule III Controlled Substance.

Additionally, agents found $1,104.00 in U.S. currency, hundreds of benzodiazepine pills (a Schedule IV Controlled Substance), and prescription pharmaceutical pills, including muscle relaxers, erectile dysfunction pills, and unknown pills. The pills were contained in parsed out containers, small resealable bags, and blister packs.

34. Agents observed that the room where the majority of the narcotics were located was structured like a workshop. The room had supplies indicative of drug sale, multiple functioning digital scales, and a DVR with a monitor showing camera views outside the house.

35. Among the controlled substances discovered in the living room of 4671 East Talmadge Drive, law enforcement agents discovered a black notebook in the living room that contained receipts and ledgers written on small sheets of white papers, also known as "pay and owe sheets," for suspected narcotics purchased by customers and distributed by SALAZAR to said customers. The sheets in the black notebook had what appeared to be the same handwriting. Some of the sheets had in writing "paid by JC." I believe that JC refers to Juan Carlos, which are SALAZAR's first and middle names. The earliest date memorialized on the sheets was September 20, 2021. The suspected drugs listed on that pay and owe sheet were varying amounts of prices of DMT (Dimethyltryptamine, a Schedule I Controlled Substances), THC (Tetrahydrocannabinol, a Schedule I Controlled Substance), "Molly" (MDMA, a Schedule I Controlled Substance), 10 mg Percs (Percocet, a Schedule II Controlled Substance), Fet (Fentanyl, a Schedule II Controlled Substance), and other suspected narcotics.

36. Agents also found mail addressed to SALAZAR at 4671 East Talmadge Drive during the search. One of the pieces of mail was from SALAZAR's mortgage lender concerning the residence.

**H.     SALAZAR Confirmed that He Owns the House, all of the "Stuff" Inside the House belong to Him, and He Owned a Storage Unit at Another Site**

37.     After his arrest, SALAZAR was advised of his *Miranda* rights.  He knowingly and voluntarily waived his rights and decided to speak with agents without a lawyer present.

38.     Post-*Miranda*, SALAZAR said that he owns the house located at 4671 East Talmadge Drive.  SALAZAR said that all the "stuff" (drugs) in the house are his and the other two people present at his house – the temporary roommate and the friend and frequent visitor – were not associated with "any of this" (drug activity).  SALAZAR claimed that the room or guest bedroom that was pad locked, directly behind the main entrance to the house where the majority of narcotics were found, was an "office."

39.     During the interview, I asked SALAZAR if he had a storage unit at another location.  SALAZAR responded in the affirmative.

**I.     A Court-Authorized Search of SALAZAR's Storage Unit Resulted in the Discovery of Additional Controlled Substances**

40.     Later that day, after the search of 4671 East Talmadge Drive, law enforcement agents were processing evidence when a missed call from Mission Valley Self Storage displayed on the lock screen of SALAZAR's cell phone.  Agents subsequently identified the address of the facility.

41.     An agent went to the facility and identified himself as a law enforcement agent.  The manager in the facility's main office – without any apparent knowledge about the events that occurred earlier that day – asked the agent if he came to the facility to discuss SALAZAR.  The manager informed the agent that two days ago, on August 15, 2022, SALAZAR locked himself in the storage unit building after hours.  When the manager went to let SALAZAR out, SALAZAR appeared to be under the influence of drugs.

42.     The manager confirmed the specific storage unit that SALAZAR rented, that SALAZAR was the only person on the rental agreement, and identified SALAZAR by the

driver's license photo that SALAZAR submitted to rent the storage unit. The agent secured the premises in anticipation of a search warrant for SALAZAR's storage unit.

43. Later that day, law enforcement agents obtained a court-authorized warrant to search SALAZAR's storage unit at Mission Valley Self Storage. Agents found the following controlled substances inside the storage unit:

- 1.35 kilograms (2.98 pounds) of a mixture and substance that presumptively tested positive for cocaine, a Schedule II Controlled Substance;

- 6.09 kilograms (13.42 pounds) of a mixture and substance that presumptively tested positive for GHB, a Schedule I Controlled Substance; and

- 1.61 kilograms (3.55 pounds) of a mixture and substance that presumptively tested positive for codeine, a Schedule II Controlled Substance.

Additionally, agents found $50,000.00 in U.S. currency (separated into $5,000 increments contained in white envelopes), a 9mm ghost gun pistol with eight rounds of ammunition, and various prescription pharmaceutical pills, including muscle relaxers, benzodiazepines (a Schedule IV Controlled Substance), erectile dysfunction pills, and unknown pills.

44. The **Target Device** was found by agents during the court-authorized search of the residence located at 4671 East Talmadge Drive. The **Target Device** was discovered powered on and passcode locked in the living room of SALAZAR's residence. The **Target Device** was found among items indicative of drug use, sales, and drug evidence in the living room, such as containers and resealable baggies containing multi-colored suspected MDMA pills, vials and resealable baggies containing residue and powder of suspected cocaine, multiple baggies containing powders and crystalline substances of suspected methamphetamine, a functioning digital scale with suspected cocaine residue, and $1,104.00 in U.S. currency. The **Target Device** had a blue protective case and cracks on the phone. During a post-*Miranda* interview, SALAZAR said his cell phone was an iPhone, had cracks all over, sort of worked, and had a blue protective case.

//

//

45. Based on my investigation, I believe SALAZAR used the **Target Device** to communicate with customers and sources of supply through phone applications and cell phone call and data service to coordinate the distribution of narcotics.

46. Based on my training, experience, and conversations with other law enforcement officers, I believe that SALAZAR's residence was used as a place to prepare various types of narcotics for further distribution. I also believe SALAZAR's residence was used as a location for people addicted to various controlled substances to use narcotics brought to the residence or received from SALAZAR at the residence. Furthermore, I believe the narcotics seized were in all stages of preparation, from raw bulk to measured distributable quantities.

47. Based on my training, experience, and conversations with other law enforcement officers, I further believe that SALAZAR was using his storage locker at Mission Valley Self Storage (EC183) to store narcotics, items used to package and distribute narcotics, and the proceeds of the distribution of narcotics, among other evidence of drug distribution activity. Following the seizure of narcotics from SALAZAR's storage locker (EC183) on August 17, 2022, I obtained SALAZAR's rental agreements for storage unit EC183 and a previous storage unit AB14 from Mission Valley Self-Storage. These rental agreements were addressed to and signed by SALAZAR with SALAZAR's residence listed as 4671 East Talmadge Drive. The rental agreement for AB14 was signed by SALAZAR on July 3, 2021, and the agreement for EC183 was signed by SALAZAR on August 8, 2021.

48. Based on my investigation and the information contained in this Affidavit, I believe SALAZAR is a methamphetamine, cocaine, and GHB distributor, along with other drugs such as MDMA and Ketamine. Analysis of the **Target Device** will assist investigators in identifying the source or sources of supply for SALAZAR, along with further evidence of his drug distribution activity.

49. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names,

electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that SALAZAR was using the **Target Device** to communicate with others to further the distribution of illicit narcotics into and within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug distribution event in the days and weeks prior to an event. Co-conspirators are also often unaware of a person's arrest and will continue to attempt to communicate with that person after their arrest to determine the whereabouts of the narcotics.

50. Based on my training and experience, it is also not unusual for individuals, such as SALAZAR, to attempt to minimalize the amount of time that there were involved in their drug distribution activities, and for such individuals to be involved for months or years longer than they claim.

51. Based on the facts and information contained in this Affidavit, I request permission to search the **Target Device** for data beginning on September 20, 2021 up to and including August 17, 2022. Based on the facts of this investigation and my training and experience, I believe that SALAZAR was using the residence at 4671 East Talmadge Drive since at least September 20, 2021 (the earliest date memorialized in the pay-and-owe sheets) to distribute controlled substances within the United States. Based on the facts of this in investigation and my training and experience, I additionally believe that SALAZAR was using his storage locker (EC183) at Mission Valley Self Storage at or following that approximate time period to facilitate such drug distribution activity.

## METHODOLOGY

52. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and

can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

53. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

54. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

55. Law enforcement previously obtained a warrant to search the **Target Device** and download its contents. The United States is seeking the instant warrant to obtain an additional download of **Target Device** for prosecution.

**CONCLUSION**

56. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of SALAZAR's violations of 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Joseph Clark*
_____
Special Agent Joseph Clark
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this April 5, 2023.

*Daniel E. Butcher*
_____
Honorable Daniel E. Butcher
United States Magistrate Judge
Southern District of California

# ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Red Apple iPhone
>IMEI: 356552102651890
>Seized as Exhibit N-30
>(" **Target Device** ")

The **Target Device** is currently in the possession of the Drug Enforcement Administration, at 4560 Viewridge Avenue, San Diego, CA 92123.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 20, 2021, up to and including August 17, 2022:

a. tending to indicate efforts to possess with intent to distribute federally controlled substances;

b. tending to identify accounts, facilities, storage Device, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of or possession with the intent to distribute controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of or the possession with the intent to distribute controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846.